

**SIGNED this 21 day of December, 2006.**

_____
**JOHN T. LANEY, III**
**UNITED STATES BANKRUPTCY JUDGE**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE MIDDLE DISTRICT OF GEORGIA
### COLUMBUS DIVISION

| | | |
|---|---|---|
| IN RE: | : | |
| | : | |
| STEPHEN MICHAEL GRAUPNER | : | CASE NO. 06-40237 JTL |
| | : | |
| Debtor. | : | CHAPTER 13 |
| | : | |

_____

### <u>MEMORANDUM OPINION</u>

Before the Court is creditor Nuvell Credit Corporation's (hereinafter, "Nuvell") objection to

the confirmation of Debtor's Chapter 13 Plan wherein Nuvell's secured claim in Debtor's 2005

Chevrolet Silverado would be bifurcated into secured and unsecured portions and "crammed down."

At issue is whether Nuvell holds a purchase money security interest in Debtor's vehicle.  A matter of

apparent first impression in this District and this state, the Court must specifically determine whether

under Georgia law the financing of negative equity in a trade-in vehicle with the purchase of a new

vehicle precludes the seller/lender from holding a purchase money security interest in the new

vehicle. This determination directly impacts the application of the anti-bifurcation provisions of the

"hanging paragraph" of 11 U.S.C. § 1325(a) added by the Bankruptcy Abuse Prevention and Consumer Protection Act (hereinafter, "BAPCPA").

The matter was taken under advisement following a hearing held on July 18, 2006. The parties have submitted numerous briefs, the last of which was presented in letter form by Debtor on December 12, 2006.[1] For the reasons set forth below, the Court holds that under Georgia law, in the context of the sale of a motor vehicle in accordance with Georgia's Motor Vehicle Sales Financing Act,[2] the term "price," as used in the Georgia definition of "purchase money security interest,"[3] includes any amount paid to satisfy a security interest in a motor vehicle used as a trade-in. Nuvell, therefore, holds a purchase money security interest in Debtor's vehicle and Nuvell's objection to confirmation of Debtor's Chapter 13 Plan must be SUSTAINED. This is a determination as a matter of law; all facts relevant to the inquiry regarding Nuvell's purchase money security interest status are not in dispute.

## FINDINGS OF FACT

On June 23, 2005, Debtor Stephen Michael Graupner purchased, for his personal use, a 2005 Chevrolet Silverado Pickup Truck (hereinafter, the "Vehicle") from King Chevrolet Kawasaki. King Chevrolet subsequently transferred and assigned for value its rights under the Retail Installment Sale Contract (hereinafter, the "Contract") to Nuvell Credit Corporation (hereinafter, "Nuvell"). Nuvell Financial Services Corporation services Debtor's account on behalf of Nuvell. Nuvell filed its proof of claim with the Court on April 21, 2006 indicating a secured debt owed in the amount of $33,670.31. The proof of claim shows that Nuvell's claimed value of the vehicle is also $33,670.31.

---

[1] For ease of identification, the various briefs submitted by the parties will be referenced by date of submission rather than by the title given to each brief by the filing party.

[2] O.C.G.A. § 10-1-30 to -42 (2000).

[3] O.C.G.A. § 11-9-103(a)(2) (2002).

The Contract for the sale of the vehicle was attached to the Nuvell's proof of claim and was entered into evidence at the July 18, 2006 hearing.

In the Contract, under the section titled "Itemization of Amount Financed," the "cash price" for the vehicle is listed as $32,919.12. Under that same section, a "Net trade-in payoff to Nuvell" of $3,347.50 is listed, bringing the total amount financed to $36,384.62 after inclusion of a $19.00 government certificate of title fee and a $99.00 dealership document fee. The $3,347.50 paid to Nuvell as a net trade-in payoff, represented a portion of the negative equity Debtor owed on a 2002 Chevrolet Silverado Pickup Truck that was traded in at the time of the purchase of the Vehicle in question. A $3,000.00 manufacturer's rebate reduced the total negative equity amount from $6,347.50. The contractual rate of interest was 13.99%. Nuvell's security interest is recorded on the face of the Certificate of Title for the Vehicle.

Debtor filed for Chapter 13 relief on April 19, 2006. The Vehicle was, therefore, purchased within 910 days of Debtor's filing for relief. Debtor's Chapter 13 Plan, filed with the Court on April 28, 2006, proposes to cram-down Nuvell's claim, paying it to the extent of $23,375.00, Debtor's alleged current fair market value of the Vehicle according to Schedule B, at 8% interest. Debtor's plan also proposes to pay general unsecured creditors zero percent of their claims. The unsecured portion of Nuvell's claim after bifurcation, would therefore, not be paid. In his plan, Debtor states that the debt owed to Nuvell totals $33,995.00.

## DISCUSSION AND CONCLUSIONS OF LAW

There has been much debate in bankruptcy courts around the country as to the meaning and effect of the "hanging paragraph" provision added to § 1325(a) by BAPCPA. This Court has held, with the majority of courts considering the Section, that the hanging paragraph or § 1325(a)(*)

3

simply has the effect of precluding debtors from bifurcating undersecured claims using § 506, as was common practice prior to the October 17, 2005 effective date of this BAPCPA provision. Whatever the conclusion courts reach regarding the effect or meaning of the hanging paragraph, each court must determine whether the Section applies by inquiring whether the four requirements of the Section are satisfied: (1) the creditor has a purchase money security interest; (2) the debt was incurred within 910 days preceding the filing of the debtor's case; (3) the collateral for the debt consists of a motor vehicle; and (4) the motor vehicle was acquired for the personal use of the debtor.[4] It is undisputed that requirements (2), (3), and (4) are met in this case. Whether Debtor can bifurcate the claim of Nuvell into secured and unsecured portions under § 506, as has been proposed in his plan, will depend on whether the Court finds that Nuvell holds a purchase money security interest in Debtor's Vehicle. If the Court finds that Nuvell does indeed hold a purchase money security interest, then Debtor must amend his plan to pay Nuvell the full contract balance of its secured claim at the *Till* rate of interest if Debtor retains possession of the Vehicle.[5]

The Court agrees with the parties that whether a creditor holds a purchase money security interest is a matter of state law.[6] As such, the Court is required to apply Georgia law on purchase money security interest, the most obvious of which is the statutory definition of the term found at Official Code of Georgia Annotated (hereinafter, "O.C.G.A.") § 11-9-103. That Section provides in relevant part as follows:

### Purchase money security interest; application of payments; burden of establishing

(a) *Definitions.* As used in this Code section, the term:

---

[4] 11 U.S.C. § 1325(a)(*) (2005).

[5] *See In re* Murray, 352 B.R. 340 (Bankr. M.D. Ga. 2006) (Laney, J.).

[6] *In re* Freeman, 956 F.2d 252, 254 (11th Cir. 1992); *See In re* Carter, 169 B.R. 227, 228 (Bankr. M.D. Ga. 1993) (Laney, J.).

4

(1) "Purchase money collateral" means goods or software that secures a purchase money obligation incurred with respect to that collateral.

(2) "Purchase money obligation" means an obligation of an obligor incurred as all or part of the **price** of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used.

(b) *Purchase money security interest in goods.* A security interest in goods is a purchase money security interest:

(1) To the extent that the goods are purchase money collateral with respect to that security interest . . . .[7]

Because the Court must interpret a Georgia statute, Georgia rules regarding statutory interpretation and construction will be applied. Section 1-3-1 of the O.C.G.A. provides:

**Construction of statutes**

(a) In all interpretations of statutes, the courts shall look diligently for the intention of the General Assembly, keeping in view at all times the old law, the evil, and the remedy. Grammatical errors shall not vitiate a law. A transposition of words and clauses may be resorted to when a sentence or clause is without meaning as it stands.

(b) In all interpretations of statutes, the ordinary signification shall be applied to all words, except words of art or words connected with a particular trade or subject matter, which shall have the signification attached to them by experts in such trade or with reference to such subject matter.[8]

Although the courts are directed to "diligently" seek out the intention of the Georgia General Assembly, the courts are left to fend for themselves in this search since there is no official record of legislative history in Georgia. Where this is the case, courts must discern legislative intent from the language of the statute itself. The directives of O.C.G.A. § 1-3-1 do not conflict with the plain-meaning doctrine, a basic tenant of statutory construction. Where a statute is plain on its face and

---

[7] O.C.G.A. § 11-9-103 (2002) (emphasis added).

[8] O.C.G.A. § 1-3-1 (2000).

free of ambiguity, the intention of the legislature, with regard to the effect or meaning of the statute, is to be the effect or meaning of the plainly read statute.  Terms of the statute, where they are not words of art or words associated with a particular trade or subject matter, O.C.G.A. § 1-3-1(b) directs, are to be given their ordinary meaning.  Although some sort of legislative history would be a helpful tool in discerning legislative intent, it would not be employed unless application of the interpreted statute according to its plain meaning would yield an absurd result.  Only then, could the court analyzing the statute vary from the plain meaning of the statute and seek guidance in the legislative history.

With the enactment of the hanging paragraph of § 1325(a), this Court has been required to consider the meaning of O.C.G.A. § 11-9-103 on several occasions.  On each occasion, the Court has noted that at first glance Georgia's purchase money security interest definition appears plain and clear on its face.  What appeared clear is blurred by questions regarding the meaning of the term "price" used in the provision. Subsection (a)(2) of O.C.G.A. § 11-9-103 states that a "purchase money obligation" is an obligation "incurred as all or part of the *price* of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used."[9]  Courts and the Uniform Commercial Code (hereinafter, "U.C.C.") comments to the Section extend the meaning of the term beyond the mere sales price asked by the seller for the purchase of the good.  The meaning of the term "price" has been decisive in the Court's past decisions and the same is true for the case at hand.  If the term "price," as used in Georgia's purchase money security interest definition, can include negative equity owed on a trade-in vehicle, then Nuvell's security interest would be one in purchase money and the hanging paragraph would apply considering that the other three requirements have been satisfied.

In his brief, Debtor directs the Court to several cases he contends support his position that negative equity included in the amount paid by Debtor for his Vehicle precludes Nuvell from holding a purchase money security interest in that Vehicle. Debtor first cites this Court's opinion in the case of *In re Carter*.[10] In *Carter*, the Court considered the debtor's lien avoidance motion. The issue for determination in the case was whether the creditor, a furniture retailer, held a purchase money security interest in the furniture, furnishings, and accessories purchased by the debtor in several transactions between December 7 and December 29 of 1989. Most of the transactions took place either c.o.d. or for cash. The balance was held on open account. The debtor made payments on her purchases for several months and then in May of 1990, signed a retail installment sales contract with the creditor providing for 36 equal monthly payments at an annual percentage rate of 14%. Under the contract, the creditor took a security interest in all the goods purchased by the debtor in December of 1989. No new money was given and no new collateral was added under the May 1990 contract.[11]

In January of 1992 the debtor refinanced the contract to lower her monthly payment and extend the contract term. No new money was given or collateral pledged. The debtor then filed for Chapter 13 relief in July of 1992, subsequently filing the motion to avoid the creditor's lien under § 522(f) of the Bankruptcy Code. Section 522(f), of course, allows debtors to avoid non-purchase money security interests in household goods.[12]

In *Carter*, the Court found that prior to the May 1990 contract, the creditor did not hold a security interest at all and that the debtor held both title and possession of the property. The Court

---

[9] O.C.G.A. § 11-9-103(a)(2) (2002) (emphasis added).

[10] 169 B.R. 227 (Bankr. M.D. Ga. 1993) (Laney, J.).

[11] *Id*. at 228.

[12] 11 U.S.C. § 522(f) (2005).

held that the creditor *never* took a purchase money security interest because the security interest taken by the creditor under the May 1990 contract was not to secure the *purchase price* of the collateral, but was taken to secure the pre-existing balance of the debtor's open account with the creditor.[13]    In support of its conclusion, the Court cited *Mark Prod. U.S., Inc. v. Interfirst Bank Houston, N.A.*,[14] wherein the Texas Court of Appeals stated that "[a]ny security interest taken as security for a pre-existing claim or antecedent debt is excluded from the purchase money category." Although the facts of *Carter* are clearly distinguishable from the facts in the case at hand, the Court recognizes the relevance of the holding in *Carter* to the discussion in this matter.

After *Carter*, Debtor cites the case of *In re Lee*,[15] another case involving a debtor's motion to avoid lien under § 522(f).  Again, the issue was whether the creditor held a purchase money security interest.  *Lee* involved two separate credit transactions.  In March of 1993, the debtor purchased table lamps from the creditor under a retail installment contract and security agreement.  In April of 1993, the debtor purchased a bed and bedding from creditor under a similar arrangement.  The balance owed from the purchase of the lamps was consolidated with the cash price for the bed and bedding, an insurance charge, and a finance charge.  The total amount was financed and was to be paid in twenty monthly installments.[16]

Debtor emphasizes Judge Dalis's citation of the general rule on purchase money security interest set forth in the Fifth Circuit Court of Appeals case of *In re Manuel*.[17]  That case states that "a purchase money security interest cannot exceed the *price* of what is purchased in the transaction

---

[13] *Carter*, 169 B.R. at 229.

[14] 737 S.W.2d 389, 394 (Tex. Ct. App. 1987).  The Court noted in *Carter* that the U.C.C. provision discussed by the Texas court was identical to that used in Georgia.

[15] 169 B.R. 790 (Bankr. S.D. Ga. 1994) (Dalis, J.).

[16] *Lee*, 169 B.R. at 791.

[17] 507 F.2d 990 (5th Cir. 1975).

wherein the security interest is created."[18]  In *Lee*, Judge Dalis also cited *Southtrust Bank v. Borg-Warner Acceptance Corp.*[19] and *In re Freeman*[20] in a discussion of the "transformation rule," which is the law in the Eleventh Circuit.  Under the transformation rule, where collateral secures both purchase money and non-purchase money debt, any claimed purchase money security interest is destroyed unless there is some contractual or state law method for determining the extent of the purchase money security interest.  Judge Dalis concluded in *Lee* that the creditor did not hold a purchase money security interest in the collateral since the contract contained both a purchase money and non-purchase money component without setting forth a payment allocation formula.[21]

Debtor briefly mentions the case of *In re Horn*[22] as support for his summary of the Eleventh Circuit law on purchase money security interests that "if collateral purchased in a secured transaction secures more than its purchase price, which should include taxes and finance charges, that the transaction is a non-purchase money transaction."[23]  *Horn* involved an initial purchase money loan for a motor vehicle followed by the debtor refinancing the loan four times, each time the debtor borrowing additional funds.  After each refinancing, the creditor retained its security interest in the motor vehicle.  At issue was whether the creditor held a purchase money security interest in the vehicle for purposes of applying the hanging paragraph of § 1325(a).  The court in *Horn* concluded that the creditor did not hold a purchase money security interest in the vehicle because the debtor did not incur the entire debt as all or part of the purchase price of the vehicle.[24]  Instead, the court said the debt was comprised of the amount loaned for the purchase of the vehicle together with the four

---

[18] *Manuel*, 507 F.2d at 993 (emphasis added).

[19] 760 F.2d 1240 (11th Cir. 1985).

[20] 956 F.2d 252 (11th Cir. 1992).

[21] *Lee*, 169 B.R. at 794.

[22] 338 B.R. 110 (Bankr. M.D. Ala. 2006).

[23] Debtor's Brief at 4 (July 28, 2006).

separate, subsequent, and additional cash advances.[25]  The debtor's vehicle, therefore, clearly secured more than the debt incurred to acquire it.  As such, the anti-bifurcation provision of the hanging paragraph on § 1325(a) was inapplicable.

Debtor also directs the Court to the case of *In re Vega*,[26] which involved a creditor's objection to confirmation for noncompliance with the hanging paragraph.  The factual situation in *Vega* is very similar to that of the case at bar.  Further, the legal issues raised in *Vega* also run parallel to those the Court must decide in this case, placing the decision in *Vega* squarely on point.  The facts of the case are as follows:  In April of 2004, the debtors executed a loan contract and security agreement for the purchase of a motor vehicle.  The vehicle served as security for the debt.  In December of 2005, the debtors entered into a second loan contract with the same creditor for the purchase of a second vehicle.  The debtors and creditor agreed that the lien on the first vehicle would be released and that the balance owed on the first vehicle would be "rolled into" the new note; the total amount secured by the second vehicle.  The debtors kept the first vehicle, which was free and clear of liens.  The total amount of the second loan was $8,789.98.  The "cash price" for the second vehicle was $6,793.98.  The second loan was entered into only 15 days prior to the debtors filing their bankruptcy petition.

In *Vega*, the debtors' Chapter 13 plan proposed to pay $6,794 to the creditor, the agreed purchase price of the second vehicle, and to surrender the first vehicle in full satisfaction of the amount rolled into the second loan, which represented the balance owed on the first vehicle.  The debtors claimed that their plan provision did not violate the anti-bifurcation provision of the hanging paragraph because they proposed to pay the full purchase price of the second vehicle (the collateral

---

[24] *Horn*, 338 B.R. at 113.

[25] *Id*. at 114.

10

for the second loan) plus interest, over the life of the plan.[27]   The creditor argued that the entire

contract balance must be paid with interest according to the hanging paragraph of § 1325(a).

Considering Kansas's definition of "purchase money obligation," which appears to be identical to the

Georgia statute, and the dual-status rule[28] as adopted in Kansas, the court in *Vega* held that the

debtors' plan complied with the hanging paragraph in § 1325(a) by providing for full payment of the

portion of the secured creditor's claim representing its purchase money security interest in the second

vehicle.[29]   Debtor in the instant case makes a persuasive argument that if the court in *Vega* held,

under the dual-status rule, that the creditor's security interest was purchase money only to the extent

of the agreed price of the purchase money collateral (the second vehicle), then under Georgia law and

the transformation rule, Nuvell is precluded from having a purchase money security interest at all

since Debtor's Vehicle secures not only its purchase price, but also the negative equity owed on the

trade-in vehicle.

   In the same vein as *Vega*, Debtor also cites the Court to the recent case of *In re White*.[30]   The

case of *White* provides a thorough discussion of the issues surrounding treatment of secured vehicle

claims under BAPCPA.   In *White*, the debtor had purchased a Ford Taurus, an extended service

contract, and insurance deficiency coverage.   The debtor made no payments toward the purchase

before filing for Chapter 13 relief.   The debtor's Chapter 13 plan proposed to bifurcate the car

creditor's claim, paying the secured portion of the claim at 8% interest over the life of the plan and

---

[26] 344 B.R. 616 (Bankr. D. Kan. 2006).

[27] *Vega*, 344 B.R. at 621.

[28] Under the "dual-status rule," which is the alternative to the "transformation rule" as adopted by the Eleventh
Circuit Court of Appeals, a creditor's purchase money status is not lost merely because of a refinancing or infusion
of new proceeds.   A security interest can, therefore, be one in purchase money to the extent that goods are purchase
money collateral, and non-purchase money as to the remainder.   *Vega*, 334 B.R. at 623 n.29.

[29] *Id*. at 623.

[30] 2006 WL 2827321 (Bankr. E.D. La. Sept. 29, 2006).

paying 100% of the unsecured portion, but without interest.[31]    The creditor objected to the confirmation of the debtor's plan.  Considering the requirements of the "hanging paragraph" of § 1325(a) and Louisiana state law on purchase money security interests, the court found that the creditor did not hold a purchase money security interest in the cost of the extended service contract or the insurance deficiency coverage because those were not costs of acquiring the vehicle.[32]  The court explained that both costs were incurred voluntarily by the debtor, each was an asset independent from the vehicle, and the cost of each was paid to a third party separate and distinct from the dealer.[33]  The court in *White* did hold after a review of the retail installment contract that the creditor held a purchase money security interest in the purchase price of the vehicle, the sales tax paid, and documentation, license, title, registration, and recordation fees.[34]  The result of the court's holding in *White* was that the portion of the purchase determined to be purchase money would be subject to treatment under the hanging paragraph (paid in full at the *Till* rate of interest), whereas the non-purchase money portion of the purchase, *i.e.*, the cost of the warranty and insurance, would be paid as unsecured claims.

As Debtor notes, the court in *White* had the benefit of the dual status rule just as the court in *Vega* did.  Debtor restates his argument that the antecedent debt in the case at bar (the negative equity in the trade-in vehicle) is like the warranty and insurance debt in *White*.  Debtor argues that had the transformation rule been applicable in *White*, as it is here in the Eleventh Circuit, then the entire security interest of the creditor would have been precluded from being one in purchase money.

---

[31] *Id.* at *1.

[32] *Id.* at *3.

[33] *Id.*

[34] *Id.* at *2.

Finally, Debtor cites the case of *In re Trejos*[35] in further support of the proposition that a security interest in collateral cannot be one in purchase money where that collateral secures a debt greater than its purchase price.  In *Trejos*, the debtors had purchased a used Volkswagen and an extended warranty.  The dealership financed the purchase for 60 months at 13.35%.  The dealership assigned the debtors' contract to VW Credit, Inc. ("VW") and the debtors subsequently filed for Chapter 13 relief.  VW filed a proof of claim for the total debt owed under the contract.  The debtors' proposed to bifurcate VW's claim into a secured portion (the stipulated value of the car) and an unsecured portion, paying the secured portion at 8% over the life of the plan.[36]  The debtors argued that because the contract had been assigned, VW could not hold a purchase money security interest in the vehicle.[37]  As such, the requirements for application of the hanging paragraph of § 1325(a) were not satisfied and the treatment of VW's secured claim was held to be appropriate.  The court in *Trejos* held that the transfer of the debtors' obligation did not destroy the purchase money status of the security interest created.  The portion of the *Trejos* decision of most interest to Debtor in this case is the dicta found in footnote 31, which reads:

> **FN 31.** This case does not involve any refinancing of the initial security interest in the Passat, or the cross-collateralization of the Passat with other collateral, or the securing of non-purchase-money obligations with the purchase-money security interest in the Passat, all fact patterns that courts have found do not create, at least for consumers, purchase-money security interests. *See* Cmts. 7 & 8 to UCC § 9-103. *See also* UCC § 9-103(h).[38]

The cases cited by Debtor all involved purchase money security interest statutes either identical or substantively similar to the Georgia statute.  Considering the basic rules arising from

---

[35] 352 B.R. 249 (Bankr. D. Nev. 2006).

[36] *Trejos*, 352 B.R. at 251.

[37] *Id*. at 264.

[38] *Id*. at 266 n.31.

those cases, absent anything more, the Court could conclude that the transaction in question involved the financing of the purchase price of Debtor's vehicle along with the balance of a separate and antecedent debt (the negative equity owed on the trade-in vehicle), therefore, Nuvell's security interest could not be one in purchase money and the hanging paragraph of § 1325(a) would not apply. It should be noted that Debtor is incorrect in his statement that the Court has chosen in the past not to apply the rules set forth in the purchase money security interest cases cited by Debtor, in situations where there is a single credit transaction.[39]  Yes, in the case of *In re Murray*,[40] the Court distinguished the multiple-transaction cases from those involving single transactions, but only for the purpose of showing that antecedent debt was not at issue.[41]  *Murray* involved a credit transaction wherein monies were lent for the purchase of a single motor vehicle and items peripheral to the purchase of the vehicle—a government certificate of title fee, a documentary fee, and an extended warranty on the vehicle.  The issue in *Murray* was whether the cost of these peripheral items could be considered part of the *price* of the vehicle for purposes of applying Georgia's purchase money security interest statute.  Citing the case of *In re Staley*, the Court held that because of the nature of the additional items purchased and the relationship between those items and the vehicle, the cost of the additional items were to be considered part of the purchase price of the vehicle.[42]  As such, the simultaneous purchase of these items with the purchase of the vehicle did not disqualify the creditor's security interest from being one in purchase money.[43]

The Court must continue its inquiry beyond the seemingly obvious conclusion that Nuvell does not hold a purchase money security interest in Debtor's new Vehicle.  In its initial brief, Nuvell

---

[39] *See* Debtor's Brief at 4 (July 28, 2006).

[40] 352 B.R. 340 (Bankr. M.D. Ga. 2006) (Laney, J.).

[41] *Murray*, 352 B.R. at 348-49.

[42] *Id.* at 348, 354.

argues that the provisions of the Motor Vehicle Sales Finance Act (the "MVSFA"), found at O.C.G.A. § 10-1-30 et al., particularly O.C.G.A. § 10-1-31(a)(1), are applicable to the Court's determination of what should be considered the *price* of Debtor's Vehicle for purposes of applying the Georgia purchase money security interest statute.[44]  Nuvell is asking that the Court read portions of O.C.G.A. § 11-9-103, the purchase money security interest statute, *in pari materia* with the MVSFA.  Section 10-1-31(a)(1) of the MVFSA provides:

> **Definitions**
> (a) As used in this article, the term:
>
>> (1) "Cash sale price" means the price stated in a retail installment contract for which the seller would have sold to the buyer and the buyer would have bought from the seller the motor vehicle which is the subject matter of the retail installment contract if such sale had been a sale for cash instead of a retail installment transaction. The cash sale price may include any taxes; registration, certificate of title, license, and other fees; and charges for accessories and their installation and for delivery, servicing, repairing, or improving the motor vehicle. *The cash sale price may also include any amount paid to the buyer or to a third party on behalf of the buyer to satisfy a lease on or a lien on or a security interest in a motor vehicle used as a trade-in on the motor vehicle which is the subject of a retail installment transaction under this article.*[45]

What Nuvell is asking the Court to do in interpreting the purchase money security interest statute requires some justification, something that Nuvell has not discussed in its briefs.  The rule of *in pari materia* requires that all statutes relating to the same subject-matter, briefly called statutes "in pari materia," be read, construed, and applied together, and harmonized wherever possible, so as to

---

[43]*Id.* at 354.

[44] Creditor's Brief at 5 (Aug. 11, 2006).

[45] O.C.G.A. § 10-1-31(a)(1) (2000) (emphasis added).

ascertain the legislative intendment and give effect thereto.[46]  A statute subject to interpretation may

not be construed *in pari materia* with related statutes where the language of the subject statute is

clear and unambiguous.[47]  In that case, terms of the subject statute are to be given their ordinary

meaning.  Any determination a court makes with regard to the interpretation of a statute "must not

result in unreasonable consequences and must square with common sense and sound reasoning."[48]

The Court, unfortunately, doesn't have the benefit of Georgia cases that consider the purchase

money security interest definition of O.C.G.A. § 11-9-103 in the context of motor vehicle purchases.

The reason for this is that under Georgia's Motor Vehicle Certificate of Title Act,[49] a party holding a

lien on a motor vehicle must notate such lien on the vehicle's certificate of title and file that title with

the Commissioner of Motor Vehicles.[50]  This notation and filing has the effect of perfecting the

creditor's lien and giving constructive notice to all who may subsequently acquire an interest in or

lien against the property.[51]  This procedure, subject to certain limited exceptions, represents the

"*exclusive method . . .* of perfecting or executing any lien or security interest with respect to motor

vehicles."[52]  The effect of this statutory scheme was, therefore, to render the purchase money status

of a security interest in a motor vehicle irrelevant given that the priority of competing liens is

determined solely by the notations appearing on the vehicle's certificate of title and not by special

priority and perfection rules regarding purchase money security interests.  The purchase money status

of a creditor's security interest in a motor vehicle only became relevant with Congress's enactment

---

[46] Monticello, Ltd. v. City of Atlanta**,** 499 S.E.2d 157, 159 (Ga. App. 1998); Undercofler v. L. C. Robinson & Sons, Inc., 141 S.E.2d 847, 849 (Ga. App. 1965) (citing *Harrison v. Walker*, 1 Ga. 32 (1846)).

[47] *Undercofler*, 141 S.E.2d at 850 (citing *Ryan v. Comm'rs of Chatham County*, 48 S.E.2d 86, 87 (Ga. 1948); *Standard Oil Co. of Ky. v. State Revenue Comm'n*, 176 S.E. 1 (Ga. 1934); *State Revenue Comm'n v. Alexander*, 187 S.E. 707 (Ga. App. 1936); 82 C.J.S. Statutes § 366 b, p. 813. cf., *Oxford v. Carter*, 120 S.E.2d 298 (Ga. 1961)).

[48] Ga. Mental Health Inst. v. Brady, 436 S.E.2d 219, 222 (Ga. 1993).

[49] O.C.G.A. § 40-3-1 to -95 (2004).

[50] Hull v. Transp. Acceptance Corp., 341 S.E.2d 330, 331 (Ga. App. 1986).

[51] *Id.*

16

of the hanging paragraph of § 1325(a).

Returning to Nuvell's argument that the Court should interpret Georgia's purchase money security interest statute (O.C.G.A. § 11-9-103) *in pari materia* with the MVSFA, the Court must first determine whether § 11-9-103 is ambiguous.  If the statute is clear on its face, then the Court must apply the plain-meaning doctrine, giving the terms of the statute their ordinary meaning so as to discern the intention of the Georgia General Assembly with regard to the statute.  If the statute is found to be ambiguous, then the Court must determine whether § 11-9-103 and the MVSFA are, in fact, *in pari materia*, *i.e.*, related to the same subject matter or purpose.  If so, then the statutes should be construed together and harmonized where possible.

The Georgia Supreme Court has defined "ambiguity" as follows: "duplicity; indistinctness; an uncertainty of meaning or expression . . . ; of doubtful or uncertain nature; wanting clearness or definiteness; difficult to comprehend or distinguish; of doubtful purport; open to various interpretations."[53]  It seems apparent to the Court that the exact meaning of the term "price," as found in the definition of "purchase money obligation" in Georgia's purchase money security interest statute (O.C.G.A. § 11-9-103), is not clear from a plain reading of the statute.  Although the term appears simple enough to understand, in the context of the statute, the extent or reach of the term is uncertain.

Nuvell argues in its brief that the purchase price of Debtor's Vehicle was not just the "amount on the window sticker of the vehicle [but instead,] $36,384.62 . . . [,] the agreed dollar amount between the Dealer and the Debtor."[54]  Nuvell stated that "[t]he transaction enabled the

---

[52] Barnes v. Gen. Motors Acceptance Corp., 381 S.E.2d 146, 148 (Ga. App. 1989).

[53] Early v. Kent, 108 S.E.2d 708, 709 (Ga. 1959) (citing *Novelty Hat Mfg. Co. v. Wiseberg*, 55 S.E. 923, 924 (Ga. 1906)).

[54] Creditor's Brief at 5 (Aug. 11, 2006).

17

Debtor to purchase the Vehicle. The security interest was taken to secure the purchase price of the collateral because *this* purchase for *this* debtor was $36,384.62, not anything less."[55] It would not be unreasonable to conclude that the term "price," as used in the definition of "purchase money obligation," could be narrowly defined to mean only the "sticker" price of the collateral, but also broadly defined to include other costs related to and contemporary with the purchase of the collateral. Consider, for instance, how Uniform Commercial Code comment 3 to the purchase money security interest provision expands the meaning of "price" beyond simply the "sticker" cost of the collateral. The comment provides that:

> [T]he definition of "purchase-money obligation," the "price" of collateral or the "value given to enable" includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations.[56]

The term is simply not definite or certain in its meaning or extent, which directly impacts the inquiry the Court is charged with conducting.

The Court believes that this finding of ambiguity satisfies Georgia's exception to the rule of *in pari materia* that such statutes cannot be considered unless there is an ambiguity in the subject statute. It should also be remembered that "[t]he intention of the legislature is the cardinal guide to construction of statutes and, when plainly collected, should be carried into effect, though contrary to the literal sense of terms."[57] As noted above, the Georgia General Assembly codified this rule in O.C.G.A. § 1-3-1(a) stating that: "In all interpretations of statutes, the courts shall look diligently for

---

[55] *Id.*

[56] U.C.C. comm. n.3 to O.C.G.A. 11-9-103 (2002).

[57] Oxford v. Carter, 120 S.E.2d 298, 300 (Ga. 1961).

the intention of the General Assembly, keeping in view at all times the old law, the evil, and the remedy."[58]  There is authority in Georgia that even though a statute is deemed unambiguous, it may still be construed and harmonized with statutes *in pari materia* where the literal interpretation of the statute would be at odds with legislative intent.[59]

As to whether the MVSFA is sufficiently related to the purchase money security interest statute so as to be considered *in pari materia*, Debtor contends in his brief that the MVSFA "has nothing to do with the creation of purchase money security interest."[60]  Instead, Debtor states that the MVSFA "establishes the requirements and prohibitions as to 'retail installment contracts' . . . and nothing else."[61]  Debtor notes Nuvell's argument that state law contemplates a situation where a purchaser trades in a vehicle towards the purchase of a new vehicle and the purchaser's negative equity in the trade-in vehicle is included in the "cash sale price" of the new vehicle.  Debtor rejects this argument stating that that MVSFA does not expressly allow for the antecedent debt, *i.e.*, the negative equity in the trade-in vehicle, to be greater than and even increase the actual cash price of the new vehicle.[62]  Nuvell responds in its reply brief that the MVSFA is the governing statute that regulates the financing of motor vehicles in the State of Georgia and that it is through the MVSFA that "price" is established in the context of the retail installment sale of a motor vehicle.[63]  As to Debtor's argument that the MVSFA definition of "cash sales price" does not contemplate an antecedent debt that is greater than or increases the cash price of the new vehicle, Nuvell points to the definition of "cash sales price," which states that "[t]he cash sale price may also include ***any***

---

[58] O.C.G.A. § 1-3-1(a) (2000).

[59] *See Oxford*, 120 S.E.2d at 300-01.

[60] Debtor's Brief at 2 (Aug, 28, 2006).

[61] *Id*. (citing *Massey v. Stephens*, 270 S.E.2d 796 (Ga. App. 1980).

[62] *Id*.

[63] Creditor's Brief at 1 (Aug. 28, 2006).

19

***amount*** paid to the buyer or to a third party on behalf of the buyer to satisfy a lease on or a lien on or

a security interest in a motor vehicle used as a trade-in on the motor vehicle which is the subject of a

retail installment transaction under this article."[64]   Nuvell argues that the MVSFA, as the governing

statute of retail installment sales of motor vehicles in Georgia, is an appropriate starting point for the

Court's inquiry.[65]

Regarding the general applicability of the MVSFA, Debtor states in his brief that the contract

for the purchase of Debtor's new vehicle may be in violation of Section 10-1-31(a)(1) of the

MVSFA.[66]   In response, Nuvell submits that the contract in question is titled "Retail Installment Sale

Contract" and absent contrary evidence, is a valid binding contract under the terms of the MVSFA.[67]

Absent any evidence or substantive argument to the contrary, the Court is inclined to conclude that

considering the nature of the transaction and the subject matter involved, the MVSFA is implicated

and applicable.

Despite urgings by Debtor to ignore the MVSFA, the Court is struck by language appearing

in that Act which brings its provisions squarely into the realm of relevance when considering the

issue of purchase money security interests in the context of a retail installment sale of a motor

vehicle.  Section 10-1-31(a)(9) of the MVSFA defines "Retail installment contract" or "contract" as

"an instrument or instruments creating a purchase money security interest."[68]   This language seems

to relate O.C.G.A. § 10-1-31(a)(9) directly to O.C.G.A. § 11-9-103.  Recall that in order for statutes

to be considered *in pari materia*, they must relate to the same subject matter or purpose.  Debtor's

argument that O.C.G.A. § 10-1-31 and the other provisions of the MVSFA do not *determine*

---

[64] O.C.G.A. § 10-1-31(a)(1) (2000) (emphasis added).

[65] Creditor's Brief at 1 (Sept. 13, 2006) (citing *In re Carter*, 169 B.R. 227 (Bankr. M.D. Ga. 1993)).

[66] Debtor's Brief at 2 (Aug. 28, 2006).

[67] Creditor's Brief at 1-2 (Sept. 13, 2006).

purchase money security interest status, is, however, well taken.

In his brief, Debtor cites the case of *Massey v. Stephens*,[69] which is the only case that the Court could find concerning the interplay between the two statutes. *Massey* involved the purchase of a mobile home and a subsequent suit by the purchasers against the seller alleging breach of implied warranty, violations of the Federal Truth-In-lending Act ("TILA"), and violations of the MVSFA.[70] Following discovery, the seller of the mobile home moved for summary judgment and the motion was granted as to the TILA and MVSFA counts. The purchasers appealed. The facts in *Massey* are that the mobile home was purchased from the seller for a "cash sales price." The seller did not provide financing for the mobile home, but instead, it was provided by a bank. The Georgia Court of Appeals found that:

> [T]he actual sale of the mobile home was not a "retail installment transaction" whereby [the] seller[] furnished the financing and took or retained a purchase money security interest in the mobile home. [The seller] sold [the mobile home] to the [buyers] for a "cash sales price" . . . and the Bank . . . financed the loan for the "cash sales price" the proceeds of which were then paid to [the seller]. The Bank, not [the seller], had a purchase money security interest in the mobile home . . . . [The seller] . . . did not have a security interest within the terms of [the purchase money security interest definition].[71]

The court of appeals held that the MVSFA was inapplicable to the transaction and affirmed the trial court's grant of summary judgment.[72]

It is clear from the *Massey* opinion that the Court of Appeals considered the purchase money security interest statute first to determine whether the MVSFA was applicable. This was done in

---

[68] O.C.G.A. § 10-1-31(a)(9) (2000).

[69] 270 S.E.2d 796 (Ga. App. 1980).

[70] *Massey*, 270 S.E.2d at 796.

[71] *Id*. at 799.

[72] *Id*.

accordance with the MVSFA definition of "retail installment contract" as implicated by the MVSFA

definition of "retail installment transaction." The MVSFA defines "retail installment contract" or

"contract" as "an instrument or instruments creating a *purchase money security interest*."[73] Neither

the trial court nor the Court of Appeals in *Massey* had to move beyond the plain meaning of the

purchase money security interest statute. Just as the Court of Appeals stated, the seller in *Massey* did

not furnish the financing and, therefore, could not take a purchase money security interest in the

mobile home. The issue of what costs could be included in the "price" of the mobile home was not

considered in *Massey*. The issue in *Massey* regarding the MVSFA was decided by application of an

unambiguous provision of the purchase money security interest statute. The trial court and the court

of appeals did not have to proceed beyond the basic provisions of the purchase money security

interest statute.

This Court is faced with a different issue and different considerations. Today's inquiry

concerns whether antecedent debt in the form of negative equity in a trade-in vehicle can be

considered part of the "price" of collateral for purposes of the Georgia purchase money security

interest statute. Even though the MVSFA does not in itself provide the definition of purchase money

security interest, its provisions aid the Court in deciding what meaning the term "price," as it appears

in the purchase money security interest statute, should be given in the context of a retail installment

sales transaction. The Court, therefore, finds that the MVSFA is sufficiently related to the subject

matter of the purchase money security interest statute, O.C.G.A. § 11-9-103, to justify the Court's

reading of the statutes *in pari materia*. Considering and construing the statutes together is essential

to the Court in carrying out the charge given in O.C.G.A. § 1-3-1(a) that "[i]n all interpretations of

statutes, the courts shall look diligently for the intention of the General Assembly, keeping in view at

---

[73] O.C.G.A. § 10-1-31(a)(9) (2000) (emphasis added).

all times the old law, the evil, and the remedy."[74]

Recall from above the MVSFA definition of the term "cash sale price."  In 1999, the last sentence of that subsection was added which reads:  "The cash sale price may also include any amount paid to the buyer or to a third party on behalf of the buyer to satisfy a lease on or a lien on or a security interest in a motor vehicle used as a trade-in on the motor vehicle which is the subject of a retail installment transaction under this article."[75]  The meaning of this provision is clear that in a retail installment contract, the cash sales price term may include negative equity in a trade-in vehicle.

Reading § 10-1-31(a)(1) of the MVSFA with § 10-1-31(a)(9) and *in pari materia* with the purchase money security interest statute, the Court must conclude that the Georgia General Assembly intended, with its 1999 amendment to the MVSFA, to permit negative equity in a trade-in vehicle to be added to the cash sales price of a new vehicle without precluding the financing creditor or its assignee from taking a purchase money security interest in the new vehicle.  For the Court to conclude otherwise would render the negative equity payoff provision of O.C.G.A. § 10-1-31(a)(1) ineffectual and meaningless.  If the Georgia General Assembly intended to create a statutory scheme regulating the retail installment sale of motor vehicles that would be applicable only where such a transaction would create a purchase money security interest, why would the General Assembly amend that scheme to add a permissive provision that when acted upon would preclude the creation of a purchase money security interest and render the scheme inapplicable to the type of transaction it was intended to regulate.  The General Assembly would not intend such an absurd result and in the limited context of retail installment transaction involving a motor vehicle, the term "price," as used

---

[74] O.C.G.A. § 1-3-1(a) (2000).

[75] O.C.G.A. § 10-1-31(a)(1) (2000).  Note also that the second sentence of the subsection provides that "[t]he cash sale price may include any taxes; registration, certificate of title, license, and other fees; and charges for accessories and their installation and for delivery, servicing, repairing, or improving the motor vehicle."  *Id.*

in Georgia's purchase money security interest statute, must be given the meaning set forth in § 10-1-31(a)(1) of the MVSFA.

Applying the O.C.G.A. § 10-1-31(a)(1) definition of "cash sale price" to the facts of this case, the monies paid on Debtor's behalf to payoff the balance owed on the trade-in vehicle are part of the purchase price of Debtor's new Vehicle for purposes of O.C.G.A. § 11-9-103, Georgia's purchase money security interest statute. The other requirements of O.C.G.A. § 11-9-103 being met, Nuvell's security interest in the Vehicle is one in purchase money.

## <u>CONCLUSION</u>

Having carefully considered the briefs of the parties and the applicable statutory and case law, the Court finds that creditor Nuvell holds a purchase money security interest in Debtor's 2005 Chevrolet Silverado. Considering that all of the other requirements of the hanging paragraph of § 1325(a) have been satisfied, Nuvell's objection to the confirmation of Debtor's Chapter 13 Plan must be SUSTAINED given that Debtor's proposed treatment of Nuvell's secured claim violates the anti-bifurcation provision of the hanging paragraph of § 1325(a). In accordance with Georgia law, a retail installment transaction involving the financing of negative equity in a trade-in vehicle with the purchase of a new vehicle does not alone preclude the financing creditor or its assignee from holding a purchase money security interest in the new vehicle.